[Crim. No. 11948.   In Bank.   June 20, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. PETER PAUL FIORITTO, Defendant and Appellant.

Donald F. Powell, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Elizabeth Miller and Mark W. Jordan, Deputy Attorneys General, for Plaintiff and Respondent.

MOSK, J.—Defendant Peter Paul Fioritto appeals from a judgment convicting him of burglary in the second degree. (Pen. Code, § 459.) At trial the People introduced into evidence a confession signed by defendant, and defendant contends that this confession was elicited under circumstances that were violative of the standards enunciated by the United States Supreme Court in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. We conclude that under the explicit directives of *Miranda* defendant's confession was inadmissible, and accordingly the judgment must be reversed.

Defendant and two companions burglarized a market in the early morning hours, stole a small amount of cash and three cardboard boxes packed with cartons of cigarettes, and proceeded to a bowling alley where they peddled the cigarettes at

a dollar a carton. At trial three persons identified defendant as the person from whom they had purchased cigarettes. One of the two accomplices described the burglary, recounted the sales at the bowling alley, and detailed defendant's participation in the crime. No evidence was offered by the defense.

The prosecution also introduced a confession made by defendant to police officers following his apprehension. The facts surrounding the making of the confession are not in dispute. After defendant was brought into the police station, he was administered the standard advice now required by the *Miranda* decision. The detective who so informed defendant then asked him to sign a waiver of his constitutional rights. Defendant refused. Almost immediately thereafter the officers confronted defendant with his two accomplices, both juveniles, who had confessed and had implicated defendant. In the presence of the officers, one of the juveniles and the defendant engaged in a heated argument over an eight-dollar loan. The juveniles were then taken out, and the detective again advised defendant of his rights, inquiring anew if he would like to sign the waiver and confess. Defendant then signed the waiver and confessed to the crime.

On this appeal the sole issue is the admissibility of defendant's confession. The People insist that the confession was admissible because the record contains no suggestion of impermissible interrogation techniques on the part of the detective who conducted the interview. But the People misconceive the *ratio decidendi* of *Miranda*. ▮ A principal objective of that decision was to establish safeguards that would liberate courts insofar as possible from the difficult and troublesome necessity of adjudicating in each case whether coercive influences, psychological or physical, had been employed to secure admissions or confessions. We need not review here the history that produced the *Miranda* decision since it has been analyzed in innumerable cases and commentaries. ▮ It is sufficient to reiterate the words of Chief Justice Warren: "The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 458 [16 L.Ed.2d 694, 714, 86 S.Ct. 1602, 1619, 10 A.L.R.3d 974].)

It becomes our constitutional responsibility, therefore, to determine in every criminal case that the full panoply of *Miranda* "protective devices" is satisfied. As we shall explain, defendant Fioritto's confession failed to comport with a specific "protective device" in the *Miranda* opinion.

We must first ascertain whether in this case police authorities were under an obligation to give the *Miranda* warnings. ▮ As that opinion makes plain, the procedural safeguards therein come into play only where "custodial interrogation" is involved, and by "custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 444 [16 L.Ed.2d 694, 706, 86 S.Ct. 1602, 1612, 10 A.L.R.3d 974].) ▮ While the defendant here had not been formally arrested, we have long held that a suspect must be fully apprised of his rights upon being ushered into a police station and detained for questioning. (See, e.g., *People* v. *Furnish* (1965) 63 Cal.2d 511, 516 [47 Cal.Rptr. 387, 407 P.2d 299]; *People* v. *Chaney* (1965) 63 Cal.2d 767, 769 [48 Cal.Rptr. 188, 408 P.2d 964].) Unquestionably Fioritto's freedom of action had been effectively restricted, and he was thus entitled to be given the *Miranda* warnings. Indeed, the very fact that the authorities administered these admonitions illustrates police recognition that any questioning they undertook was during a custodial period.

The central issue in this case, accordingly, is whether defendant's subsequent confession was admissible after he initially refused to waive his constitutional rights. ▮ Again, we look to the *Miranda* opinion for guidance, and on this point it could not be more explicit: "Once warnings have been given, the subsequent procedure is clear. *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.* Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been *once invoked.*" (Italics added.) (384 U.S. 436, at pp. 473-474 [16 L.Ed.2d 694, at pp. 722-723, 86 S.Ct. 1602, at pp. 1627-1628, 10 A.L.R. 3d 974].)

■ By his refusal to waive his constitutional rights initially, defendant indicated that he intended to assert his rights—the privilege had been *once invoked*—and all further attempts at police interrogation should have ceased. Although the confrontation of defendant with his two juvenile accomplices who had confessed injected a new factor into the questioning, the didactic language of the United States Supreme Court shows no disposition to permit subsequent interrogation in the absence of counsel even if authorities believe there has been a change of circumstances. Thus we have no alternative but to hold that the confession thereafter secured constituted inadmissible evidence at trial.

■ In so holding, we prohibit only continued questioning after an individual has *once* asserted his constitutional rights. We do not, of course, disapprove of the use of statements, whether admissions or confessions, voluntarily initiated by a suspect. Such statements have been repeatedly sanctioned in the decisions of this court (see, e.g., *People* v. *Jacobson* (1965) 63 Cal.2d 319, 328 [46 Cal.Rptr. 515, 405 P.2d 555]), and are also expressly authorized in the *Miranda* opinion. "There is no requirement," said the court, "that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment. . . ." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 478 [16 L.Ed.2d 694, 726, 86 S.Ct. 1602, 1630, 10 A.L.R.3d 974].) Thus in *People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202], we approved admission of later statements by the defendant after he had repeatedly been given admonitions of his constitutional rights. But we noted (at p. 392) that the defendant " 'had initiated the offer to the police to tell them what happened,' " and, indeed, according to the trial judge, Lara " 'made a very sophisticated approach by trying to make a deal with the officers. Both he and the officers agree that he instituted this, not the officers.' " Again, in *People* v. *Treloar* (1966) 64 Cal.2d 141 [49 Cal.Rptr. 100, 410 P.2d 620], we distinguished between interrogation by police and initiation of discussion by a defendant. The court there found two complete confessions "solicited by the police" (p. 143) and three other statements "entirely spontaneous and in no way elicited by the police" (p. 147). In *People* v. *Tomita* (1968) 260 Cal.App.2d —— [66 Cal.Rptr. 739] (hearing denied) the defendant was

advised of and asserted his constitutional rights. The following morning, the day of his arraignment, the defendant summoned the arresting officer to his cell and voluntarily began a discussion of the events leading to his arrest. The court noted (at p. ——) that the defendant had "initiated a conversation" and under those circumstances the authorities were not precluded from using the volunteered statements.

We reiterate, however, that the foregoing authorities are inapposite under circumstances in which the police initiated resumption of interrogation. The form of the renewed queries, however subtle or gentle, cannot be considered in determining whether there has been a violation of the stern principles prescribed by the Supreme Court in *Miranda*.

The People and the defendant, who was but 19 years of age, differ as to whether the People's case against him for burglary, absent the confession, was overwhelming. That issue is not before us, however, for we cannot reweigh the evidence to ascertain whether there was prejudice. ■ It is settled that the introduction of a confession obtained from a defendant in violation of constitutional guarantees is prejudicial per se and requires reversal regardless of other evidence of guilt. (*People* v. *Powell* (1967) 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137]; *People* v. *Schader* (1965) 62 Cal.2d 716, 728-731 [44 Cal.Rptr. 193, 401 P.2d 665]; *Jackson* v. *Denno* (1964) 378 U.S. 368, 376 [12 L.Ed.2d 908, 915, 84 S.Ct. 1774, 1780, 1 A.L.R.3d 1205].)

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., and Sullivan, J., concurred.

BURKE, J.—I dissent. The principal objective of the *Miranda* decision was the prevention of in-custody interrogation by police of suspected criminals without first advising them of their constitutional rights, affording them an opportunity to exercise them, or securing from them a waiver of such rights.[1] In the instant case defendant twice was fully and completely advised in writing of such rights prior to his

---

[1]*Miranda* v. *Arizona*, 384 U.S. 436, 478-479 [16 L.Ed.2d 694, 726, 86 S.Ct. 1602, 1630, 3 A.L.R.3d 974], summarizes its guidelines for control of in-custody interrogation as follows: ". . . we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards

signing of a written waiver thereof and prior to *any* in-custody interrogation. In *Miranda,* and in the three cases decided with it,[2] the defendants were not given a "full and effective warning of [their] rights at the outset of the interrogation process."

The majority assert that *Miranda* is nevertheless applicable to the present case because they believe the conduct of the police violated one of the guidelines laid down by the court to govern future in-custody interrogation, namely: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Here, upon first being advised of his rights and asked if he wished to sign a waiver and to make a statement, defendant replied in the negative. Some conversation followed about psychiatric help, defendant indicating that he needed such help, and an officer stating that possibly on the "state level" he could get such aid. There was no interrogation of defendant. A few minutes later the officers brought defendant's two younger juvenile accomplices into the room where defendant was, and, in the presence of the officers permitted them to talk to defendant. Defendant was also a juvenile, 19 years of age, though the oldest of the three, but he was a parolee and therefore somewhat sophisticated in the field of law enforcement. The juveniles informed defendant that they had confessed and that they had involved him in the burglary. No questions were asked at that time by the police. After the younger juveniles left, the investigating officer again fully advised defendant of his rights and again asked him if he wished to sign the waiver and talk, to which defendant answered in the affirmative. Defendant then signed the

must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

[2]*Vignera* v. *New York, Westover* v. *United States,* and *California* v. *Stewart.*

waiver and only thereafter were questions asked of defendant. Interrogation proceeded in the presence of a stenographer who transcribed the statement which was signed by defendant and later introduced in evidence. The form of the written waiver and the statement itself, so signed by defendant, are set forth in full.[3]

The court, in *Miranda,* states (p. 477 [16 L.Ed.2d at p. 725,

---

[3] "SPECIFIC WARNING

"1. You have the right to remain silent.

"2. Anything you say can and will be used against you in a court of law.

"3. You have the right to talk to a lawyer and have him present with you while you are being questioned.

"4. If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning, if you wish one.

"WAIVER

"5. Do you understand each of these rights I have explained to you?
    YES    No

"6. Having these rights in mind, do you wish to talk to us now?
    YES    No

"Dated 8-11-66

"The foregoing was read and fully explained to Peter Fioritto on 8-11-66 at the Ontario P.D. 2:25 P.M.

By O. N. Robards #146 (signature of officer(s))

"The above is true

Refused to sign                    (signature of Person to be Questioned.)

"The pertinent portions of the transcribed statement are as follows:

"Q: Have you been advised of your right to remain silent and your right to an attorney and that anything you say could be used against you in case of prosecution and that if you can't afford an attorney the County will provide one?

"A. Yes.

"Q. Did you sign a waiver to this effect?

"A. Yes.

"Q. What is your full name?

"A. Peter Paul Fioritto.

"Q. How old are you and what is your birth date?

"A. Nineteen; my birth date is April 4, 1947.

"Q. What is your address?

"A. 1503 W. Berkeley Court, Ontario.

"Q. What is your phone number?

"A. Yu 6-7724.

"Q. Do you know why you are here at the Ontario Police Department?

"A. Yes.

"Q. Would you tell us why?

"A. For burglarizing a grocery store.

"Q. Where was this grocery store located?

"A. Etiwanda Avenue in Mira Loma.

"Q. When did this take place?

"A. Saturday night.

86 S.Ct. at p. 1629]); that upon the suspect's refusal to talk the police remain entirely free to continue their investigative work and that its decision "is not intended to hamper the traditional function of police officers in investigating crime. . . . When an individual is in custody on probable cause, the

"Q. Approximately what time?
"A. I don't know.
"Q. During the dark hours?
"A. Yes.
"Q. Who was with you at the time of this burglary?
"A. Mike Levings and Bill Phillips.
"Q. Whose vehicle did you use?
"A. Mine.
"Q. What kind of car; describe it?
"A. A '54 Chevrolet; 4-door; dark blue top and light blue bottom.
"Q. Did you drive this car?
"A. Yes.
"Q. Whose idea was it to burglarize this store?
"A. Mike; and he wanted to do this about three days before that but we didn't.
"Q. Did he shoe [sic] you the way to this store?
"A. Yes.
"Q. In your own words, after arriving at the store, tell us what happened?
"A. We parked across the street from the store and we walked around to the back. Mike busted a window, went through the window, then opened the door on the side and he let us in from the side door. Then we went to the front of the store and Mike found some money in a drawer and all of us picked up cigarettes and Mike had the money.
"Q. Did you pack up the cigarettes before leaving?
"A. They were in a box.
"Q. A big carton?
"A. Yes.
"Q. How much money did you get?
"A. I don't know?
"Q. What was your share?
"A. About $40.
"Q. Did you take any cigars?
"A. No.
"Q. The only other merchandise was Cigarettes?
"A. Yes.
"Q. How much money did Mike get?
"A. I don't know.
"Q. How much did Bill get?
"A. I guess we all had about the same. We had more after we sold the cigarettes.
"Q. Was the merchandise loaded in your car?
"A. Yes.
"Q. In the trunk?
"A. Yes.
"Q. Then where did you go after leaving that area?
"A. Back to Ontario; to a gas station, got gas and split up the money.

police may, of course, seek out evidence in the field to be used at trial against him.''

A reading of the questions and answers contained in defendant's statement shows that it is completely free of any form of pressure, threat, trickery, cajolery or improper conduct of the kind condemned by the *Miranda* decision.

*Miranda* specifically states that ''Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.'' This court noted in *People* v. *Cotter*, 63 Cal.2d 386, 393, 396 [46 Cal.Rptr. 622, 405 P.2d 862] (vacated on another ground in

---

"Q. What did the three of you do?
"A. Went to the Bolium.
"Q. In Montclair?
"A. Yes.
"Q. What happened there?
"A. We sold the cigarettes there.
"Q. You sold the stolen cigarettes?
"A. Yes.
"Q. Who to?
"A. Just people coming out.
"Q. What did you sell them for?
"A. $1.00 a carton.
"Q. How many would you say you sold at this time?
"A. Around 30 cartons.
"Q. What happened to this money?
"A. We split it up, too.
"Q. How many cartons of cigarettes did you take from the burglary?
"A. There was maybe 50.
"Q. What happened to the other 20 cartons?
"A. We sold them all to one guy—a colored guy, kid, who lived on Ralston Street.
"Q. Mr. Cotton you mentioned?
"A. No, just some kid. Bill wasn't there; me and Mike sold them.
"Q. How much did you get?
"A. Six Dollars.
"Q. Do you know the boy's name?
"A. I don't know his name.
"Q. Where does he live?
"A. On Ralston.
"Q. Where?
"A. I am not sure. We talked to him on Ralston and then talked to him later.
"Q. Does any of the guys know him?
"A. I think Mike does.
"Q. Was this the same night?
"A. No, it was the next day.
"Q. Sunday?
"A. Yes, Sunday.

386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 1035]), that the *Escobedo, Dorado* and *Stewart* decisions were "aimed at restraining law enforcement officers, once the accusatory stage has been reached, from the use of inquisitorial techniques in seeking to prove the charge against the accused out of his own mouth. They were never intended to discourage a defendant from volunteering to the police his complicity in the perpetration of a crime *nor to prohibit the police from receiving and acting upon such confessions. . . .*

*"Neither this court, nor the United States Supreme Court, has ever taken the position that the desire of a guilty man to confess his crime should be stifled, impeded, discouraged, or hindered in any way. The contrary is true."* (Italics added.)

This is the nub of the case before us: whether the police are enjoined from requesting a waiver, once the defendant has been fully advised of his constitutional rights. The majority completely disregard this central issue, clearly presented and established in this case, by merely stating, "Although the confrontation of defendant with his two juvenile accomplices who had confessed *injected a new factor into the questioning,* the didactic language of the United States Supreme Court shows no disposition to permit subsequent interrogation in the absence of counsel even if authorities believe there has been a change of circumstances. Thus we have no alternative but to hold that the confession thereafter secured constituted inadmissible evidence at trial." (Italics added.)

---

"Q. Were you implicated any way in other jobs in that area—at a previous time were you connected with any burglary in another establishment in that area?

"A. No.

"          .     .     .     .     .     .     .     .     .     .     .

"Q. Have we used any force or violence on you to give us this statement?

"A. No.

"Q. Have we made any promises of reward or immunity from prosecution to give us this statement?

"A. No.

"Q. Are the statements you have given us true and correct to the best of your knowledge?

"A. Yes.

"Q. Do you realize this statement could be used against you in case of prosecution?

"A. Yes.

"Q. After you have read this statement would you be willing to sign same?

"A. Yes."

Such conclusion by the majority misreads and improperly applies the express permissive guideline further furnished by *Miranda* (p. 479 [16 L.Ed.2d at p. 726, 86 S.Ct. at p. 1630, 10 A.L.R.3d 974]) : ''After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.'' In this case, obedient to *Miranda,* there was no questioning of defendant regarding the details of the burglary or of defendant's involvement therein prior to his signing of the written waiver. Nowhere in *Miranda* do we find a prohibition against an inquiry by police if a suspect desires to sign a waiver and to speak following a full warning as to his constitutional rights. Such an inquiry comports with and supports a knowing and intelligent waiver. When, as here, such a waiver is voluntarily given the subsequent statements, according to *Miranda* itself, are admissible.

The trial court conducted a full inquiry into the voluntary nature of defendant's confession. Defense counsel was afforded every opportunity to cross-examine the investigating officers on *voir dire,* and the judge, with *Miranda* rules in mind, properly determined that the confession was voluntary and should be admitted. That ruling, entirely supported by the record, should be sustained by this court.

The majority opinion introduces the novel interpretation that a voluntary statement must be *initiated* by the defendant and cites *People* v. *Lara,* 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202], wherein the defendant, after being repeatedly advised of his constitutional rights, initiated his offer to tell the police what had happened. The distinction is clear, and it is obvious that a statement made under such conditions would be deemed voluntary. It does not follow, however, that every inquiry of a defendant who has been fully advised of his constitutional rights if he desires to waive those rights and make a statement must be deemed coercive and prohibited by *Miranda.* Such a request is not interrogation for the purpose of eliciting incriminating statements, but is specifically an inquiry for permission, which may be denied, to conduct such interrogation. Hence, the problem reduces itself into whether such an inquiry (whether defendant desires to waive his rights) is coercive per se. To hold that it is would definitely conflict with former decisions of this and other courts, and in my opinion with *Miranda.*

The nature of conduct that may be deemed coercive has

been fully expounded by this court on many occasions. In *People* v. *Hill,* 66 Cal.2d 536, 550 [5] [58 Cal.Rptr. 340, 426 P.2d 908], decided after *Miranda,* we held that confrontation of a defendant by codefendants who had confessed and had involved the defendant, as in the present case, did not render defendant's subsequent confession inadmissible as the product of coercion or custodial compulsion.

In *People* v. *Hunter,* 252 Cal.App.2d 472, 478 [60 Cal. Rptr. 563], the defendants were warned of their constitutional rights and then shown or told of confessions of their codefendants. The court held that there was no "trick" or "device" used to get them to confess.

In *Cox* v. *United States* (8th Cir. 1967) 373 F.2d 500, 502, the defendant refused to speak to the police. The police then confronted him with information garnered from his codefendant. After then being advised of his rights, the defendant confessed to the crime and made a signed statement. The court held the confession to be voluntary.

*Miranda* indicates that a lengthy interrogation before a statement is made may be evidence that the accused did not validly waive his rights. But that possibility does not concern us here. The confrontation by the juvenile accomplices, the conversation between the parties, and the giving of advice of constitutional rights by the police, followed by the written waiver, did not take more than 15 minutes. In *Hill,* the investigation of and confrontation by the codefendants extended over a period of days, yet this court stated (66 Cal.2d at p. 553) : ". . . there is no reason why, once having requested counsel and the request having been recognized by a cessation of interrogation, the accused cannot elect to proceed without counsel if that election is freely, knowingly and intelligently made." Here, that was the whole point of the trial judge's inquiry and express finding.

In *People* v. *Ditson,* 57 Cal.2d 415, 433 [20 Cal.Rptr. 165, 369 P.2d 714], this court upheld the admission of a defendant's statement, and said: "But absent something other than mere questions, or exhortations to tell the truth or clear his conscience or help himself by revealing facts as to the dominant part of [a codefendant] or some other person in the criminal enterprise, there appears to be nothing on the face of the record which would support a finding of overreaching or coercion. . . . We recognize, of course, that coercion can be

psychological as well as physical. But in this we must exercise great care not to become confused: intellectual persuasion is not the equivalent of coercion.''

*Miranda* does not require that police officers remain mute upon a defendant's declination to make a statement or to exercise his constitutional rights. ''Interrogation'' only is proscribed, and an inquiry to determine whether a defendant desires to waive his rights after being fully informed of them is not an interrogation.

I would affirm the judgment of the trial court.

McComb, J., concurred.